Gershengorn, J.
This case is a dispute over environmental contamination in the soil and groundwater of two properties in Wilmington, 65 Industrial Way and 80 Industrial Way. A jury returned a verdict for the plaintiff (“the Trust”) against one of the defendants, Bayer Corporation (“Bayer”). That verdict included special questions concerning claims of negligence, breach of contract, breach of warranty, breach of the implied covenant of good faith and fair dealing and misrepresentation, and for response costs and property damage under G.L.c. 21E, §§4 & 5 (1994 & Supp. 2001). The verdict slip also included advisory questions on the plaintiffs claim (Count XVI) that Bayer had violated G.L.c. 93A, §11 (1997). The jury awarded the Trust damages and also returned an advisory verdict in its favor on its claim that Bayer had violated G.L.c. 93A, § 11 (1997), with unfair and deceptive acts connected to the contamination at 80 Industrial Way, and a finding that Bayer’s violations of Chapter 93A were not knowing and willful. This Court presided over the trial and now makes the following findings of fact and rulings of law pertaining to this claim, based on all the credible evidence and reasonable inferences drawn therefrom:

FINDINGS OF FACT

The Trust owns the properties located at 65 and 80 Industrial Way in Wilmington. Plaintiff Arthur W. Kanavos (“Mr. Kanavos”) works for the Trust and manages its property. He is a “hands on manager” and has, by experience and training, expertise in property management. He spends much of his time at 65 and 80 Industrial Way.
Bayer and its corporate predecessors and affiliates, Compugraphic, Agfa Corp., Miles, Inc., and the Agfa Division of Bayer, all occupied 65 Industrial Way until 1992. Agfa continues to occupy 80 Industrial Way. Bayer and these corporate predecessors and affiliates used (at 65 Industrial Way) and continue to use (at 80 Industrial Way) the facilities at these properties to manufacture electronic equipment. The manufacturing process in *375 volves numerous harmful environmental contaminants, and this was well known to Mr. Kanavos. Indeed, through the years, Mr. Kanavos has had occasion to view the manufacturing process at these properties.
As early as 1987, the Trust commissioned environmental assessments for 80 Industrial Way, first from Rizzo Associates, Inc. and TGG Environmental, Inc., and later, in 1989, from Kuperferman & Weber. These site assessments did not reveal the presence of significant levels of contamination, but noted that hazardous chemicals had been used on the property. Specifically, the 1987 report from Rizzo Associates noted that chlorinated solvents had been used at the site, and recommended that subsurface soil and groundwater samples be collected to determine whether hazardous materials had been released. TGG Environmental, which conducted this subsurface investigation, concluded in its report “that the available evidence does not suggest a significant presence of oil or hazardous materials exists in the environment of the site.” Kupferman & Weber’s 1989 report stated, “(T]here is alow degree of risk with respect to the presence of significant levels of oils or hazardous materials present in the environment of the site,” and recommended that the soil beneath the chlorinated solvent tank be “tested for volatile compounds when the tank is removed.”
In the summer of 1990, Bayer discovered trichloroethylene (“TCE”) and 1,1,1 -trichloroethane (“1,1,1-TCA”) in a drywell at 65 Industrial Way. The Trust and Bayer each hired engineers, respectively Kupferman & Weber and Metcalf & Eddy, to assess the environmental conditions. After the assessments, the engineers reported minimal contamination.
In 1994, the Trust, desiring to renovate 65 Industrial Way, obtained a financing commitment from Hibernia Bank. The bank required an environmental report, and the Trust retained Loitherstein Environmental Engineering (“Loitherstein”) to conduct an updated assessment. The Trust discovered a “reportable concentration” of certain volatile organic compounds (“VOCs”), including 1,1-dichloroethane, a degradation byproduct of 1,1,1-TCA. The Trust then notified the Massachusetts Department of Environmental Protection (“DEP”), as required under the Massachusetts Contingency Plan (“MCP"), and began remediation.
On December 5, 1994, Richard Ramsden, Bayer’s Vice President of Operations at 80 Industrial Way, sent an e-mail to Joseph Carbanello, Manager for Environmental Health and Safety for Bayer’s Agfa Division, suggesting an updated assessment of the conditions at 80 Industrial Way. The e-mail stated, in pertinent part:
[Qonducting the 2 IE study well before [Bayer] vacate[s] the building will be more beneficial than attempting to do this project near the end of the lease; as it will allow us to address any potential problems without interference by the landlord. I think if we carefully work with Metcalf & Eddy, we can have everything go smoothly; have it done once with plenty of time to intervene if necessary.
I specifically find that this e-mail does not show bad faith on the part of Bayer, nor does it show an intent or endeavor on the part of Bayer to conceal information unlawfully from the Trust. Likewise, the e-mail does not show that Bayer sought to manage or control impermissibly the environmental work at 80 Industrial Way. To the extent that such an inference is even possible, I decline to draw it.
In 1995, Bayer again retained Metcalf & Eddy to conduct an environmental site assessment of 80 Industrial Way. Metcalf & Eddy produced two reports. In August 1995, Metcalf & Eddy produced a report that detailed the presence of certain hazardous compounds in the soil and sewer lines and expressed concern over possible broken sewer lines that carried wastewater. Based on soil sampling at various locations around 80 Industrial Way, the August 1995 report concluded: (1) VOCs had been detected in soil under the building and near the sewer lines (which were not required to be reported under the MCP); (2) arsenic had been detected in one place at levels above reportable concentrations; and (3) poly-chlorinated biphenyls (“PCBs”) had been detected in locations next to the building’s electrical transformers. Metcalf & Eddy recommended:
(1) groundwater monitoring wells be installed to evaluate whether VOCs detected in the soil were also present in the groundwater;
(2) a Limited Removal Action to address the PCB release; and
(3) additional arsenic sampling to determine if the detected exceedance was an “anomalous arsenic spike.”
In October and November 1995, Metcalf & Eddy conducted additional work at 80 Industrial Way. Metcalf & Eddy conducted a limited removal action to remediate the PCB contamination in the soil near the transformer. Metcalf & Eddy also installed groundwater monitoring wells and re-sampled in the area of the previously detected arsenic, but did not find levels of arsenic that were required to be reported. At no time did Bayer attempt to manipulate or interfere improperly with Metcalf & Eddy’s ESA or its subsequent remediation. I specifically credit the testimony of Willard Baker, a vice president at Metcalf & Eddy, that he would have resisted efforts to have the ESA conducted in any way he thought improper, and indeed I find that Bayer made no such efforts.
The Metcalf & Eddy reports were not given to the Trust. I do not find this withholding to have been done with an improper motive. Bayer was not secretive or deceptive about its environmental assessment and remediation activities at 80 Industrial Way, and I find that the Trust was well aware of Metcalf & Eddy’s assessment and remediation activities at each site. There were continuous meetings between Bayer and Mr. Kanavos re *376 garding the environmental conditions at each site. Indeed, in May of 1996, at a meeting with Mr. Opalka, Bayer’s facilities manager for Bayer’s Agfa Division, Mr. Kanavos discussed his desire to do his own comprehensive environmental assessment of 80 Industrial Way, and specifically indicated to Mr Opalka that he did not want to rely on Metcalf and Eddy. Mr. Kanavos asked Mr. Opalka to have Bayer pay for the study or at least share the cost of the study with him. I do not credit Mr. Kanavos’s testimony that he was not aware of the work being done by Metcalf & Eddy at 80 Industrial Way. Metcalf & Eddy’s work was conducted during the day and involved the use of large machinery. Soil samples were removed by hand and transferred to a 30 cubic yard roll-off container. I find instead, that Mr. Kanavos was dissatisfied with the failure of both Metcalf and Eddy and indeed his own environmental expert to have discovered the contamination at 65 Industrial Way, and he wanted his own person to do the assessment. I find that Bayer made no misrepresentations to Mr. Kanavos regarding the environmental conditions at 80 Industrial Way, nor did Mr. Kanavos rely on Bayer for his information of the environmental conditions at 80 Industrial Way. Each side employed their individual environmental experts.
In December 1996, the Trust filed suit against Bayer and the individual defendants, who are Bayer employees, seeking to recover costs incurred in remediating the contamination at 65 Industrial Way. In June 1997, the Trust notified Bayer that it intended to do a comprehensive environmental assessment at 80 Industrial Way and requested that Bayer produce any environmental information about the property in its possession. Bayer declined to do so and referred that request to its attorneys. At that point, the parties were in contentious litigation regarding 65 Industrial Way and were communicating through counsel. Bayer declined to provide the Metcalf & Eddy reports to the Trust, but in October 1997 Bayer granted to the Trust access to 80 Industrial Way to conduct an updated assessment.
In the summer of 1997, the Trust retained Loitherstein to conduct an environmental assessment of 80 Industrial Way. In April 1998, Loitherstein discovered substantial concentrations of 1,1,1 -TCA in the groundwater beneath the buildings at levels exceeding reportable concentrations under the MCP. Bayer filed a Release Notificaton Form with DEP in July 1998. Also in 1998, Bayer hired Environmental Resources Management, Inc. (“ERM”), to conduct assessment and remediation work at 80 Industrial Way. From the summer of 1998 to the present, John Mctigue of ERM has been the “Licensed Site Professional” of record at the site. Under his direction, Agfa has conducted the remediation of 80 Industrial Way. The Trust has nonetheless employed its own expert to verify all of Mr. Mctigue’s work and to make independent findings to the Trust.
In September 1998, the Trust moved to amend its complaint to add claims relating to 80 Industrial Way, including the current claim under G.L.c. 93A, §11. The Court allowed that motion on October 13, 1998. On September 14, 2000, Bayer conceded liability for negligence and for response costs and property damage under Chapter 2IE at both 65 and 80 Industrial Way, and entered into a stipulation of liability on those claims. The trial in this case began before the jury on September 15, 2000, and concluded on October 17, 2000.

RULINGS OF LAW

General Laws, Chapter 93A, Section 11 states, in pertinent part:
Any person who engages in the conduct of trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in trade or commerce of an unfair method of competition or an unfair and deceptive act or practice . . . may . . . bring an action in the superior court . . . for damages and such equitable relief ... as the court deems necessary and proper.
The Trust has presented three theories of liability under this section: First, the Trust argues that the evidence shows that the totality of Bayer’s conduct evinced knowing unfairness and deception in its environmental practices by rigging Metcalf & Eddy’s 1995 assessments and remediation efforts at 80 Industrial Way, and by concealing the 1995 Metcalf & Eddy reports from the Trust. Second, the Trust argues that Bayer had an obligation to make a reasonable settlement offer to cover the contamination at 80 Industrial Way and failed to fulfill this obligation. Third, the Trust contends that Bayer violated its lease by misrepresenting the environmental conditions at 80 Industrial Way.
The law is clear that a Judge is not bound by a jury’s findings where the jury has made an advisory finding on a 93A claim. “While ajudge may request a jury’s advisory opinion, [s)he is not bound by it ... It is indeed both possible and feasible for ajudge deciding a 93A claim to make findings of fact that are contrary to those made by a jury on a parallel common law claim.” Kattar v. Demoulas, 433 Mass. 1, 12 (2000); Bressel v. Jolicouer, 34 Mass.App.Ct. 205, 211 (1993). This Court now turns to the plaintiffs theories of liability in this case.
I. The Totality of Bayer’s Conduct
As noted in the findings, this Court has found that there was no bad faith on Bayer’s part, and its negligent handling of hazardous chemicals does not amount to a 93A violation. This Court therefore finds against the Trust on its first theory of liability, concerning the totality of Bayer’s conduct.
The e-mail detailed above that led to Metcalf & Eddy’s updated assessment and remediation efforts at 80 Industrial Way in 1995, upon which the Trust places great weight, does not lead to a contrary finding. The quoted portion of the e-mail suggests only that Bayer wanted to *377 deal with any contamination on its own. Furthermore, Bayer’s decision to refer the Trust’s request for production of materials concerning 80 Industrial Way to its attorneys does not evince unfairness or deception, in light of the prior dispute about Bayer’s disclosure of Metcalf & Eddy’s assessment and remediation efforts.
Defendant hired independent environmental professionals to advise it of the environmental conditions at 80 Industrial Way and followed their advice. When advised by its consultants that there was contamination at the site, Bayer followed their recommendations. When reportable levels of contamination were discovered, Bayer hired and paid for a licensed site professional to assess and remediate the problem, and when required to do so, Bayer reported the contamination to the appropriate state authority and followed the MCP regulations. The Trust makes much of a Bayer employee who claims to have witnessed a spill at 80 Industrial Way and reported the spill to his supervisor. There is no evidence that Bayer should have known that those chemicals would leach into the surrounding bedrock and result in the contamination . . . And to this day there is no credible evidence and I do not find that accidental, isolated spill created any of the problems at 80 Industrial Way. Futhermore, Bayer made no misrepresentations to the Trust. The Trust was not relying on Bayer’s efforts. The Trust, at all times relevant here, knew the kind of operations conducted on the premises of 80 Industrial Way, and conducted its own investigations of environmental conditions at the site. Bayer neither made misrepresentations nor sought to mislead the Trust as to any contamination problems at 80 Industrial Way.
In sum, this Court finds that Bayer did not wrongfully withhold information from the Trust, and I do not find that Bayer induced Metcalf & Eddy to avoid sampling the soil and groundwater under the buildings at 80 Industrial Way. This Court does not find any credible evidence that Bayer knew about the contamination beforehand and deceived the Trust, nor did Bayer in any way rig the 1995 assessment or remediation reports.
II. Bayer’s Alleged Obligation to Make a Reasonable Settlement Offer
Section 11 of Chapter 93A does not extend liability for the failure to make a reasonable settlement offer when liability is reasonably clear.
This Court does not agree with the statutory, basis for plaintiffs second theory of liability. Neither G.L.c. 93A, §9(3), nor G.L.c. 93A, §11, requires reasonable settlement offers; rather, they only offer them as an option to defendants, as a means of fixing potential liability. Parties in litigation may negotiate a settlement, and the circumstances of a particular case may convince a defendant that an earlier, lower settlement is better than pressing forward at additional cost and risk. Neither of these two possibilities, nor the circumstances of this case, however, convinces this Court that even where liability is reasonably clear all defendants must make a reasonable settlement offer or violate G.L.c. 93A, §9 and/or §11.
The text of G.L.c. 93A, §11, which is the basis for the Trust’s claim, includes the following language:
The respondent may tender with his answer ... a written offer of settlement for single damages. If such tender or settlement is rejected by the petitioner, and if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages.
Subsection 9(3) of G.L.c. 93A contains similar, but more stringent language:
Any person receiving such a demand letter who, within thirty days: of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner.
Importantly, though, G.L.c. 93A, §9(1), includes explicit language making a violation of G.L.c. 176D, §3(9) (which applies only to those in the “business of insurance!,]” see G.L.c. 176D, §§1 & 2) also a violation of Chapter 93A, §9, subject to liability under that section. See Clegg, 424 Mass. 413, at 418; Van Dyke, 388 Mass. at 674-75 (citing Dodd, 373 Mass. at 81-82). Section 11 of Chapter 93A contains no such language, and the case law suggests that liability tinder these sections does not run parallel; rather, violations of G.L.c. 93A, §9 are actionable under Section 11 only to the extent that they are also violations of G.L.c. 93A, §2.[1] Polaroid Corp. v. The Travelers Indem. Co., 414 Mass. 747, 754 (1993); Jet Line Servs., Inc. v. American Employers Ins. Co., 404 Mass. 706, 717 n. 11 (1989); Transamerica Ins. Group v. Turner Constr. Co., 33 Mass.App.Ct. 446, 452 (1992); cf. Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 503 (1979) (citing Nader v. Citron, 372 Mass. 96, 99-101 (1977)). Section 11 of Chapter 93A does not address liability for the failure to make a reasonable settlement offer, nor does it directly “incorporate violations of G.L.c. 176D, §3, cl. 9 . . . within its prohibitions as does G.L.c. 93A, §9.” Jet Line Servs., 404 Mass. at 717 n. 11. Application of G.L.c. 93A, §11 in the circumstances of this case would place Bayer in the position of an insurance company, which it is not. Bayer had no legal duly to make a reasonable settlement offer.
III. Bayer’s Representations and Its Lease with the Trust
The Trust argues that Bayer violated an implied covenant of good faith and fair dealing under their lease agreement by not informing it of environmental contamination at 80 Industrial Way or by not making diligent efforts to discover the contamination. Bayer argues that this lease violation amounts to a violation of Chapter 93A.
*378 As noted above, I do not find that Bayer acted in bad faith; nor do I find that Bayer made an intentional misrepresentation of a material fact. Further this Court need not at this time determine whether it is a violation of 93A for a renter to make a negligent misrepresentation of fact the truth of which is reasonably ascertainable as there is no credible evidence that under the circumstances of this case Bayer knew or should have known there were reportable concentrations of contaminants on the property.

ORDER

For the foregoing reasons, this Court ORDERS that judgment shall enter in favor of the DEFENDANT, Bayer Corporation, on the Trust’s claim under G.L.c. 93A, §11 (Count XVI).

 The language of the specific clause in G.L.c. 93A, §9(1) may even preclude the Trust’s second theory of liability. The relevant language reads:
Any person, other than a person entitled to bring action under Section eleven of this chapter, who has been injured by another person’s use or employment of any method, act or practice declared to be unlawful by Section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of Section three of chapter one hundred and seventy-six D may bring an action in the superior court...
(Emphasis added.)